1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  Ivan Figueroa,                          )    No. CV-14-02136-TUC-BGM
                                            )
10                    Plaintiff,            )
                                            )
11  vs.                                     )    **ORDER**
                                            )
12  Carolyn W. Colvin,                      )
    Acting Commissioner of Social Security, )
13                                          )
                      Defendant.            )
14  _____)

15          Currently pending before the Court is Plaintiff's Opening Brief (Doc. 18).  Defendant

16  filed her Responsive Brief ("Response") (Doc. 20).  Plaintiff did not reply.  Plaintiff brings

17  this cause of action for review of the final decision of the Commissioner for Social Security

18  pursuant to 42 U.S.C. § 405(g).  The United States Magistrate Judge has received the written

19  consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule

20  73, Federal Rules of Civil Procedure.

21

22  **I.      BACKGROUND**

23          ***A.      Procedural History***

24          Plaintiff received Supplemental Security Income ("SSI") benefits based on disability

25  as a child.  Administrative Record ("AR") (Doc. 15) at 14.  When Plaintiff turned eighteen

26  (18), his eligibility for SSI benefits was reevaluated under the rules for determining disability

27  in adults.  *Id.* at 14, 81.  The Social Security Administration ("SSA") denied benefits on

28  January 20, 2011.  *Id.* at 14, 81, 83–86.  On June 16, 2011, SSA denied Plaintiff's request for

1    reconsideration. *Id*. at 14, 82, 87–90.  On August 29, 2011, Plaintiff filed his request for

2    hearing. *Id.* at 14, 99–100.  On October 10, 2012, a hearing was held before Administrative

3    Law Judge ("ALJ") Norman R. Buls.  AR at 14, 34–62.  The ALJ issued an unfavorable

4    decision on November 1, 2012. *Id.* at 11–28.  On December 14, 2012, Plaintiff requested

5    review of the ALJ's decision by the Appeals Council, and on April 3, 2914, review was

6    denied. *Id.* at 1–3.  On December 11, 2014, Plaintiff filed this cause of action. Compl. (Doc.

7    1).

8              ***B.      Factual History***

9              Plaintiff was twenty (20) years old at the time of the administrative hearing and eleven

10   (11) at the time of the alleged onset of his disability.  AR at 37, 72, 102–104, 194, 273, 303,

11   328, 394.  Plaintiff obtained a high school diploma and is currently taking classes at Pima

12   Community College. *Id.* at 37, 198.

13             On August 18, 2010, Plaintiff filled out a Function Report – Adult, indicating that he

14   "get[s] up. goin [sic] the school. come home do home work wath [sic] TV for ½ hr or so go

15   to bed." *Id.* at 210.  Plaintiff indicated "cougtn [sic] and breating [sic]" affect his sleep. *Id.*

16   at 211.  Plaintiff reported that he had no problem with personal care.  AR at 211.  Plaintiff

17   stated that he requires help with his injections, and that his father prepares "meels." *Id.* at

18   212.  Plaintiff reported that he does not do any household chores, either indoor or outdoor,

19   due to his allergies and asthma. *Id.*  Plaintiff further stated that he goes out daily, either in

20   a car, walking or riding a bicycle; however, he is unable to drive himself. *Id.* at 213.

21   Plaintiff indicated that shops for clothes twice a week; and although he is able to count

22   change, he is otherwise unable to pay bills, handle a savings account or use a checkbook.  AR

23   at 213.  Plaintiff listed watching television, particularly sport wrestling as his hobby or

24   interest. *Id.* at 214.  Plaintiff also stated that he goes to school every day, and sings with the

25   school choir. *Id.*    Plaintiff listed stair climbing, completing tasks, and understanding as

26   areas which his illness affects. *Id.* at 215.  Plaintiff reported that he can walk for

27   approximately a half mile before needing to stop and rest, and can understand most

28

1   instructions, but sometimes requires them to be repeated.  *Id.*  Plaintiff responded that he gets
2   along well with authority figures, and can handle changes in routine, but his medication
3   causes nervousness.  *Id.* at 217.

4         On May 15, 2011, Plaintiff filled out a Headache Questionnaire indicating that he has
5   had severe headaches since taking growth hormone pills and his asthma respirator.  AR at
6   293.  Plaintiff reported that the headaches occur three times a day and last for an average of
7   twenty (20) to thirty (30) minutes.  *Id.*  Plaintiff further reported that the headaches cause him
8   to be unable to concentrate as well as dizziness.  *Id.*  Plaintiff reported that his medication
9   and asthma trigger the headaches, and taking Advil or laying down helps to alleviate them
10  somewhat.  *Id.* at 294.  Plaintiff further stated that the headaches make him nervous and
11  negatively affect his able to read, write, and interact with people, which causes frustration.
12  *Id.* at 236.

13        On appeal, Plaintiff completed a Disability Report – Appeal (Form SSA-3441),
14  indicating that he was suffering from more frequent headaches, and having "more trouble
15  walking due to pain in right leg."  AR at 275–90, 305–10.  Plaintiff indicated that he was not
16  currently employed, because he goes to school full-time.  *Id.* at 282.  Additionally, Plaintiff
17  reported having headaches approximately three (3) times per day.  *Id.* at 282, 287.  Plaintiff
18  stated that he gets up in the morning, goes to school all day, comes home, does homework,
19  watches some television, and goes to bed.  *Id.* at 283.  Plaintiff reported asthma attacks and
20  lack of breathing cause him to wake up at night with a migraine due to his medications.  *Id.*
21  Plaintiff further reported being able to take care of his personal hygiene, but required
22  reminders regarding his injections, because his mother provided them.  AR at 284.  Plaintiff
23  indicated that he does not do any food preparation, because he does not know how to cook,
24  and does not help with household chores due to his allergies and asthma.  *Id.* at 285.  Plaintiff
25  again reported going out every day, but cannot drive as he has been unable to pass the test
26  because of his medications, his nervousness, and inability to concentrate.  *Id.*  Plaintiff stated
27  that he shops for clothes twice a week, and is able to count change and handle a savings

28

account, but is unable to pay bills or use a checkbook.  *Id.* at 285–86.  Plaintiff listed watching television and seeing baseball games as his hobbies, but stated that he is unable to sit for long periods because of his leg and asthma.  *Id.* at 286.  Plaintiff indicated that he sings with his school choir three (3) times per week, and also attends church and school.  *Id.* Plaintiff indicated that his illness affects lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, concentration, and understanding.  *Id.* at 287.  Plaintiff reported that he can only walk approximately fifty (50) feet before he needs to rest, due to his crutches.  *Id.*  Plaintiff also indicated that he finds written instructions hard to understand, and needs spoken instructions repeated.  *Id.*  Plaintiff noted that he gets along well with authority figures, and can hand changes in routine.  AR at 288.  Plaintiff further reported using crutches, because of recent hip surgery on his right hip.  *Id.* at 288–89.

## 1.  Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that he has a high school education, and lives with his mother, father, and two brothers.  AR at 37.  Plaintiff clarified that he was in special education classes while in school, from the first grade through high school.  *Id.* at 47.  Plaintiff further testified that he does not drive, and has not ever worked.  *Id.* at 38. Plaintiff stated that he has not worked, because he does not have any experience, and he is currently continuing his education at Pima Community College.  *Id.*

Plaintiff testified that at the time of the hearing he was taking a beginning math class, a class on the administration of justice, and was scheduled to start a reading course.  *Id.* at 38–39.  Plaintiff stated that he had dropped the reading class the previous year, because the instructor did not give him the accommodations that he was entitled to.  AR at 47, 50. Plaintiff described his accommodations as having a note taker in his classes.  *Id.* at 51. Plaintiff indicated that his grades the previous semester included a D in reading, a C in criminal justice, and an F in math.  *Id.*  Additionally, his older brother helps him with his homework at night.  *Id.*

Plaintiff also testified that he travels to Mexico for family vacations and emergencies,

such as a death in the family. AR at 39. Plaintiff described his physical ailments to include issues with his right hip. *Id.* at 39–40. The ALJ noted that Plaintiff's doctor released him to unlimited activities in August, and Plaintiff agreed, but indicated that he was now having trouble with his left hip, and had an upcoming appointment with his orthopaedic doctor. *Id.* at 40. Plaintiff further testified that he did not think he would be able to lift twenty (20) pounds due to the pain in his hip from the screw that was placed in it. *Id.*

Plaintiff described his day as waking up at approximately six (6) a.m., getting dressed, brushing his teeth, putting on his shoes, and getting his backpack for school. *Id.* Plaintiff testified that his father drives him to school, for his first class at seven (7). AR at 40. Plaintiff's father returns to pick him up after class at noon. *Id.* Plaintiff also indicated that sometimes, his parents have to remind him to do things like taking a shower or washing his hair. *Id.* at 62. Plaintiff testified that he watches television in the afternoon, but has approximately two (2) hours of homework which he does in the evening. *Id.* at 41. Plaintiff further testified that he does not do any chores, but occasionally goes to the grocery store with his mom. *Id.* at 41–42. Plaintiff also testified that he has one friend at school, but is "always nervous around people[,]" because he feels different. *Id.* at 42. Plaintiff stated that between classes at school, he works at the computer or does research, but does not socialize. AR at 42. Plaintiff stated that he likes to read books like Harry Potter, as well as comedy, and can type and play games on the computer. *Id.* at 43. Plaintiff does not have a girlfriend; he did like one girl, but was afraid of her ex-boyfriend, so the relationship did not develop. *Id.* at 43–44. Plaintiff testified that would like to finish college, and work in corrections as a guard, like his older brother, or law enforcement. *Id.* at 45, 52, 59–60.

Plaintiff further testified that he is uncomfortable around people, because he feels like if he does something wrong people are watching and talking about him. *Id.* at 48, 53–54. Plaintiff also reported that he is more comfortable around younger children, than his peers. AR at 48. Plaintiff testified that he has a growth deficiency for which he receives daily injections; hormone deficiency that has resulted in delayed puberty; he is concerned about

his left hip; and has hyperthyroidism.[1]  *Id.* at 49–50.  Plaintiff said that his asthma affects him "a lot" and that if he is in too much of a hurry his throat gets extremely itchy.  *Id.* at 56. Plaintiff also stated that his hip problems were caused by his medication.  *Id.* at 57. Additionally, his medication causes him to shake and he has problems with dizziness.  *Id.* at 57–58.

Plaintiff testified that he also suffers from depression and anxiety, primarily centered around his fear of something bad happening to his family.  *Id.* at 52.  Plaintiff further testified that his depression sometimes appears as anger.  *Id.* at 52–53.  Plaintiff has learned breathing exercises to help him deal with these issues.  *Id.* at 53.  Plaintiff confirmed that he had told one of his counselors that sometimes he wants to hurt other people when he thinks they are laughing at him.  AR at 54–55.  Plaintiff also testified that he has trouble getting along with his parents, because they push him to go out.  *Id.* at 55.  Plaintiff stated that he has nightmares about bad things happening to his family, and his father wakes him up, because Plaintiff is crying in his sleep.  *Id.* at 55–56.

Plaintiff testified that he has problems understanding things, and that he would have trouble understanding instructions.  *Id.* at 57–58.  Plaintiff stated that he would not be able to get to work without help, and that he cannot take the public bus, because he feels like people are watching him.  *Id.* at 58–59.  Plaintiff testified that his parents have encouraged him to get a job, but he does not think that he is capable of working given his limitations. *Id.* at 60–62.  Plaintiff also indicated that he did not want to work in the summer, because he has wanted to travel with his family to Mexico.  *Id.* at 60.

## 2.  Plaintiff's Medical Records

On August 11, 2004, Eugene E. Campbell, Ph.D. provided a Disability Evaluation. AR at 328–32.  At the time of Dr. Campbell's report, Plaintiff was twelve (12) years old, and

---

[1]Plaintiff's medical records reflect that he was diagnosed with *hypo*thyroidism, not *hyper*thyroidism.  *See, e.g.,* AR at 349, 369.

in sixth grade, special education. *Id.* at 328.  Dr. Campbell reported that Plaintiff did not have trouble getting along with classmates or family, and listed his medical conditions as asthma. *Id.* Dr. Campbell administered the WISC-III test, and reported Plaintiff's scores as Verbal IQ 65, Performance IQ 75, and Full Scale IQ 68. *Id.* at 329. Dr. Campbell stated that these scores fell in the borderline and intellectually deficient ranges of intellectual functioning, indicating very low intelligence. *Id.* Dr. Campbell further indicated that as a result, Plaintiff did not have "the intellectual potential to perform adequately in school or to remain at grade level with his same age peers." AR at 329. Dr. Campbell further noted that "[m]ental retardation is suggested by the scores, but there is a greater likelihood that borderline potential is present and that his intelligence score has been depressed by his failure to learn adequately." *Id.* at 329. Plaintiff's Wide Range Achievement Test – Third Edition ("WRAT3") scores also "fell in the deficient and borderline ranges of academic functioning." *Id.* at 330. Dr. Campbell diagnosed Plaintiff with mild mental retardation and asthma, listing stressors as asthma and school. *Id.* at 331. Dr. Campbell opined that Plaintiff was pleasant with good social skills, and good coordination, as well as adequate adaptive skills. *Id.* at 332. Dr. Campbell further reported that Plaintiff attended and completed tasks well when he understood the material, but was learning at a much slower rate than his peers. AR at 332. On October 18, 2004, Jack A. Marks, M.D. filled out a Childhood Disability Evaluation Form, indicating that Plaintiff met listing 114.05D with his impairment of mental retardation. *Id.* at 238–43.

On August 26, 2009, Plaintiff was seen at ACP–Clara Vista Pediatrics by Gabriel Cristello, M.D. for a routine history and physical, who prescribed asthma and allergy medications. *Id.* at 340. On August 28, 2009, Plaintiff was again seen by Dr. Cristello, who ordered bone age studies. *Id.* at 339.

On September 9, 2009, Plaintiff was seen by Priti Patel, M.D. and Chetanbabu Patel, M.D., endocrinology specialists. *Id.* at 348–49, 368–69. Drs. Patel noted that he presented to them with a concern for short stature, reporting that Plaintiff did "not get teased very much

at school" and has delayed puberty.  AR at 348, 368.  Drs. Patel further indicated that Plaintiff had normal energy levels; no problems with sleep; no blurry or double vision; no difficulty swallowing or trouble with sense of smell; regular heart rate and rhythm, without murmurs; a history of asthma; no constipation or diarrhea; no bladder issues; skin clear of rashes; no joint pain or muscle weakness; and no headaches, dizzy spells, or numbness.  *Id.* Drs. Patel diagnosed Plaintiff with delayed puberty, short stature, and elevated TSH with concern of hypothyroidism.  *Id.* at 349, 369.  On September 21, 2009, Plaintiff was seen by Dr. Cristello at ACP–Clara Vista Pediatrics for a routine history and physical, who prescribed asthma and allergy medications.  *Id.* at 338.

On October 23, 2009, Plaintiff was again seen by Dr. Cristello at ACP–Clara Vista Pediatrics for a flu shot.  *Id.* at 337.  On November 11, 2009, Plaintiff saw Dr. Cristello, who prescribed Triamcinolone Acetonide 0.1% cream.  AR at 336.

On December 15, 2009, Plaintiff was seen by Dr. Priti Patel, as well as Mark D. Wheeler, M.D., for an endocrinology follow-up.  *Id.* at 346–47, 363–64.  Plaintiff had not had significant pubertal development since his previous visit, but reported normal energy level, and a good appetite.  *Id.* at 346, 363.  Additionally, Drs. Patel and Wheeler indicated that Plaintiff had no problems with sleep; no difficulty swallowing or trouble with sense of smell; regular heart rate and rhythm; and no headaches, dizzy spells, or numbness.  *Id.*  Drs. Patel and Wheeler diagnosed delayed puberty, short stature, and hypothyroidism.  *Id.* at 347, 364, 365.  They further reported that Plaintiff "continued to show growth with a good growth velocity[,]" but indicated that he may require testosterone supplementation if he does not enter puberty on his own.  AR at 347, 364.  On December 13, 2009, Plaintiff was seen by Dr. Cristello at ACP–Clara Vista Pediatrics for a routine history and physical, and prescribed asthma and allergy medications.  *Id.* at 335.

On January 10, 2010, Plaintiff was seen by Dr. Cristello at ACP–Clara Vista Pediatrics for a routine history and physical, and prescribed ProAir HFA 108 MCG/ACT Aerosol Solution.  *Id.* at 334.  On March 24, 2010, Plaintiff was again seen by Dr. Cristello

at ACP–Clara Vista Pediatrics for a routine history and physical, and prescribed asthma and allergy medication.  *Id.* at 333.  On April 20, 2010, Plaintiff was seen for an endocrinology follow-up by Dr. Priti Patel and Dr. Mark Wheeler.  *Id.* at 344–45, 359–61.  Plaintiff was again reported to have normal energy levels, no problems with sleep, and no headaches, dizzy spells, or numbness.  AR at 344, 359.  Plaintiff's diagnoses included delayed puberty, short stature, and hypothyroidism.  *Id.* at 345, 360, 362.  A decrease in Plaintiff's growth velocity was reported, as well as no significant progression in his pubertal development.  *Id.* at 345, 360.

On June 21, 2010, Plaintiff saw Priti Patel, M.D. and Chetanbabu Patel, M.D. for an endocrinology follow-up.  *Id.* at 341–43, 352–54.  Drs. Patel indicated that Plaintiff was prescribed growth hormone medication at a previous visit, and noted that Plaintiff had normal energy levels; no problems with sleep; no difficulty swallowing or trouble with sense of smell; regular heart rate and rhythm, without murmurs; a history of asthma; no bladder issues; skin clear of rashes; and no headaches, dizzy spells, or numbness.  *Id.* at 341, 352. A February 10, 2010, MRI of Plaintiff brain and pituitary indicated "[n]o evidence of focal abnormality involving the pituitary gland[,] [and] [f]indings include pituitary at lower limits of normal size for patient's age."  AR at 342, 353, 392.  An August 28, 2009 bone age study "corresponds with a bone age of 14 years at a chronological age of 17 years 2 months."  *Id.* at 342, 350, 353, 393.  Drs. Patel's diagnoses included growth hormone deficiency, delayed puberty, short stature, and hypothyroidism.  *Id.* at 342, 353, 355.  The doctors indicated that growth hormone therapy would be appropriate, and that testosterone therapy should be considered in the upcoming six (6) months to one (1) year.  *Id.* at 342–43, 53–54.

On August 17, 2010, Plaintiff was seen by Burt A. Stanga, M.D. in the Pediatric Screening Clinic of Children's Clinics for Rehabilitative Services.  *Id.* at 419, 479.  Dr. Stanga reported that Plaintiff was "in the 12th grade and doing well in school."  AR at 419, 479.  Dr. Stanga's objective findings were unremarkable.  *Id.*  His assessment of Plaintiff included growth hormone deficiency, delayed puberty, short stature, and hypothyroidism,

1   with a plan to continue seeing Dr. Patel in the Endocrinology Clinic, and Dr. Cristello for

2   primary care.  *Id.*

3          On September 4, 2010, was assessed by Francisco A. Sanchez, Ph.D. for a

4   consultative psychological exam.  *Id.* at 420–23.  Dr. Sanchez reported that Plaintiff had

5   "severe limitations for understanding and memory on test results[,] but better abilities for non

6   verbal reasoning totals[.]" *Id.* at 420.  Dr. Sanchez further reported that Plaintiff "seemed to

7   do his best even though outcomes were in the deficient range."  AR at 420.  Plaintiff's social

8   interactions were "not age appropriate[,] but adequate[,]" and Plaintiff was "[i]mpaired by

9   mental/intellectual impairment[.]" *Id.*  Plaintiff reported to Dr. Sanchez that his asthma

10  medications negatively affect his sleep, and when Plaintiff uses his Nebulizer, he "feel[s]

11  shaky." *Id.* at 421.  Plaintiff reported being awake by 6 a.m. to go to school, and Plaintiff's

12  father indicated that Plaintiff is "normal for self care and maintaining hygiene[.]" *Id.*

13  Plaintiff can fix a sandwich, ride the school bus, and is learning to manage and spend money,

14  but does not ride public transportation alone.  *Id.*  Dr. Sanchez reported that Plaintiff was

15  polite and socially appropriate and cooperative, but his mental functioning was dull and

16  concrete.   AR at 422.  Dr. Sanchez further noted Plaintiff's affect and mood were

17  appropriate, with maturity below what would be expected of an 18 year old, and self

18  confidence and assurance were poor.  *Id.*  Dr. Sanchez administered the WAIS-IV test, as

19  well as the Wide Range Achievement Test IV.  *Id.* at 422–23.  Dr. Sanchez found Plaintiff

20  indicated severe limitations in cognitive and mental intelligence.  *Id.* at 423.  Plaintiff's "full

21  scale IQ continues to suggest that client's mental reasoning ability remains significantly

22  low." *Id.*  Dr. Sanchez further opined that "[a]lthough client is capable of performing

23  nonverbal tasks and processing speed tasks fairly well, his lack of abstract reasoning, lack

24  of understanding of language, poverty of information, and his maturity problems, will impair

25  this individual from attaining gainful employment."  AR at 423.  Dr. Sanchez diagnosed

26  Plaintiff with a mood disorder not otherwise specified with mild anxious features and mild

27  mental retardation versus low borderline intellectual functioning.  *Id.*  Dr. Sanchez also

28

1    opined that "[t]his client is not capable of economic self sufficiency, self direction is
2    marginal and capacity for independent living at this time is ruled out." *Id.* at 424.   On
3    September 30, 2010, Plaintiff was again seen by Dr. Patel for an endocrinology follow-up.
4    *Id.* at 425–27.   Dr. Patel noted that Plaintiff had a normal activity level, but has had
5    occasional headaches. *Id.* at 425.   Dr. Patel further noted that Plaintiff had not had any sleep
6    problems; no difficulty swallowing or trouble with sense of smell; a regular heart rate and
7    rhythm; some history of asthma; no bladder issues; and clear skin.   AR at 425.   Dr. Patel
8    diagnosed growth hormone deficiency, delayed puberty, short stature and hypothyroidism.
9    *Id.* at 426, 428.   Dr. Patel also reported encouragement in Plaintiff's growth velocity. *Id.*

10          On October 21, 2010, Jaine Foster-Valdez, Ph.D. reviewed Plaintiff's records for a
11   Mental Residual Functional Capacity Assessment, and Psychiatric Review Technique. *Id.*
12   at 429–46.   Dr. Foster-Valdez found Plaintiff not significantly limited in his ability to
13   remember locations and work-like procedures and ability to understand and remember very
14   short and simple instructions. *Id.* at 429.   Dr. Foster-Valdez found Plaintiff moderately
15   limited in his ability to understand and remember detailed instructions.   AR at 429.   Dr.
16   Foster-Valdez reported that Plaintiff was not significantly limited in his ability to carry out
17   very short and simple instructions; to maintain attention and concentration for extended
18   periods; to perform activities within a schedule, maintain regular attendance, and be punctual
19   within customary tolerances; to sustain an ordinary routine without special supervision; to
20   work in coordination with or proximity to others without being distracted by them; to make
21   simple work-related decisions; and to complete a normal workday and workweek without
22   interruptions from psychologically based symptoms and to perform at a consistent pace
23   without an unreasonable number and length of rest periods. *Id.*   Dr. Foster-Valdez reported
24   that Plaintiff was moderately limited in his ability to carry out detailed instructions. *Id.*
25   Similarly, Dr. Foster-Valdez found Plaintiff not significantly limited in his ability to interact
26   appropriately with the general public; to ask simple questions or request assistance; to accept
27   instructions and respond appropriately to criticism from supervisors; to get along with
28

1   coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain

2   socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;

3   to respond appropriately to changes in the work setting; to be aware of normal hazards and

4   take appropriate precautions; to travel in unfamiliar places or use public transportation; and

5   to set realistic goals or make plans independently of others. *Id.* at 430.  Dr. Foster-Valdez

6   found an RFC assessment was necessary, based upon affective disorders, mental retardation,

7   and anxiety-related disorders.   *Id.* at 433.   Specifically, Dr. Foster-Valdez reported

8   impairments including a mood disorder not otherwise specified, mild mental retardation

9   versus low borderline intellectual functioning, and mild anxiety.  AR at 436–38.  Regarding

10  "B" criteria, Dr. Foster-Valdez found no restrictions of activities of daily living or difficulties

11  in maintaining social functioning, mild limitations related to difficulties in maintaining

12  concentration, persistence, or pace, and insufficient evidence to assess limitations on

13  episodes of decompensation, each of extended duration. *Id.* at 443.  Dr. Foster-Valdez also

14  reported that the evidence does not establish the presence of the "C" criteria. *Id.* at 444.  Dr.

15  Foster-Valdez opined that Plaintiff's impairments were not severe, because despite a full-

16  scale IQ of 72, and special education requirements, his mental functioning is below age

17  expectations, but only has a minimal loss of function as a result. *Id*. at 447.

18          On January 12, 2011, Plaintiff saw Enrique Suarez, M.D. for consultative physical

19  examination. *Id.* at 453–59.  Dr. Suarez reported that Plaintiff is a senior at Palo Verde High

20  School, and that Plaintiff reported having good grades and playing second base.  AR at 453.

21  Plaintiff also reported severe asthma and problems with his hormones and growth.  *Id.*  Dr.

22  Suarez's physical examination was unremarkable, with a normal range of motion of the hip,

23  knee and ankle joints reported. *Id.* at 454, 458–59.  Dr. Suarez noted that Plaintiff had only

24  been taking medications for his delayed puberty for the previous four (4) months, and as such

25  did not offer any further opinions in that regard. *Id.* at 454.  Dr. Suarez opined that Plaintiff's

26  physical conditions had not and would not impose any limitations for twelve (12) continuous

27  months. *Id.* at 455.  On January 25, 2011, Plaintiff saw Dr. Cristello concerning a small

28

patch of dry skin on his left cheek. *Id.* at 526–27. Dr. Cristello's examination was otherwise unremarkable, and he diagnosed an eczema like face rash, and recommended moisturizer twice daily. AR at 526–27.

On March 14, 2011, Plaintiff was seen by Dr. Wheeler complaining of headaches and dizziness. *Id.* at 476–78. Dr. Wheeler reported that Plaintiff had "complained of some right hip pain since January of this year[,] . . . [as well as,] occasional headaches without recent change." *Id.* at 477. Dr. Wheeler's assessment included growth hormone deficiency, delayed puberty, hypothyroidism, and hip pain. *Id.* Dr. Wheeler expressed concern regarding Plaintiff's hip pain, but otherwise continued the current dosage of his growth hormone therapy and thyroid medication. *Id.* On March 29, 2011, Plaintiff saw Dr. Cristello for strep throat. AR at 524–25.

On April 8, 2011, Plaintiff saw Dr. Cristello regarding right hip pain that had been ongoing for two (2) to three (3) months. *Id.* at 522–23. On April 18, 2011, Plaintiff had surgery scheduled with Brian Nielsen, M.D., to place a pin in his right hip. *Id.* at 292, 655. Plaintiff's admitting diagnoses was "[n]ontraumatic slipped upper femoral epiphysis[.]" *Id.* at 480–81, 494. Prior to surgery, Dr. Nielsen indicated that Plaintiff's left hip "look[ed] normal except for the trochanteric physis which is widened." *Id.* at 489. Dr. Nielsen placed a pin at the front of the femoral neck, and Plaintiff was discharged to home on April 28, 2011. AR at 480–82, 492. During Plaintiff's post-operative visit, Plaintiff did not report any problems to Dr. Nielsen and stated that his contralateral (left) hip did not hurt him in the least. *Id.* at 490. On May 24, 2011, Plaintiff saw Dr. Nielsen for a follow-up regarding his right hip, and reported that neither hip hurt. *Id.* at 491.

On June 1, 2011, Plaintiff saw Dr. Cristello regarding wheezing. *Id.* at 519–20. Dr. Cristello reported nasal congestion, and a mild obstructive result for Plaintiff's pulmonary function test. *Id.* at 520. Plaintiff was given a nebulizer with albuterol, which made him feel better. AR at 520. Dr. Cristello diagnosed reactive airway disease probably secondary to allergy. *Id.* On June 6, 2011, Plaintiff returned to see Dr. Cristello for a followup. *Id.* at

514–18.  Plaintiff reported that he was still wheezing, and Dr. Cristello recommended continuing aggressive nasal allergy management.  *Id.* at 515.  On June 16, 2011, Robert S. Hirsch, M.D. performed a records review, and determined that Plaintiff's April 2011 right femoral epiphysis repair resulted in no pain and no other problems were indicated.  *Id.* at 505. Accordingly, Dr. Hirsch found Plaintiff's hip issue non-severe.  AR at 505.  On June 24, 2011, upon reconsideration, Eugene Campbell, Ph.D. reviewed Plaintiff's file and the prior Psychiatric Review Technique Form and Mental Residual Functional Capacity assessment findings.  *Id.* at 498.  Dr. Campbell affirmed the prior decision.  *Id.*  Dr. Campbell determined Plaintiff's impairments as borderline intellectual functioning and a learning disability, and found that the combination of impairments to be severe, but that they did not meet, medically equal, or functionally equal the listings.  *Id.* at 499.  Dr. Campbell's evaluation indicated that Plaintiff was less than markedly limited in acquiring and using information, but had no limitations attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and in his health and physical well-being.  *Id.* at 501–02.

On August 19, 2011, Plaintiff was seen by Dr. Chetanbabu Patel for an endocrinology check-up.  AR at 568–72.  Dr. Patel reported that Plaintiff is doing well, no problems with headaches, blurry vision, heat or cold intolerance, or diarrhea or constipation.  *Id.* at 569. Plaintiff indicated that he had surgery for a right slipped capital femoral epiphysis ("SCFE"). *Id.*  Dr. Patel's physical examination of Plaintiff was unremarkable, although Plaintiff reported hip pain when he walks.  *Id.*  Dr. Patel diagnosed growth hormone deficiency, delayed puberty, hypothyroidism, and a SCFE.  *Id.*  He recommended increasing Plaintiff's growth hormone dose, and rechecking Plaintiff's hormone levels.  AR at 569  On August 23, 2011, Plaintiff saw Dr. Nielsen for a follow-up regarding his hips.  *Id.* at 654.  Plaintiff reported that neither hip hurt.  *Id.*  Dr. Nielsen opined that Plaintiff could do unlimited activities.  *Id.*

On December 15, 2011, Plaintiff was seen in the Emergency Department ("ED") at St. Joseph's Hospital due to shakiness after using his small volume nebulizer ("SVN")

1    machine treatment. *Id.* at 534–35. Robert J. Kingston, M.D. reported that Plaintiff's father
2    expressed concern because Plaintiff gets so shaky that he trips and falls, and Plaintiff's father
3    is worried something would happen to his right hip. *Id.* at 534. Plaintiff reported near daily
4    headaches, and admits to being under stress. AR at 534. Plaintiff's physical exam was
5    unremarkable, and the consult with a respiratory therapist suggested that Plaintiff may be
6    using non-diluted albuterol with toxic affects. *Id.* at 535.

7        On January 20, 2012, Plaintiff was seen by Dr. Chetanbabu Patel for an endocrinology
8    follow-up. *Id.* at 564–67. Plaintiff reported that he was body building in an attempt to add
9    weight, and had no issues with hip or leg pain, although reported that his right hip hurts when
10   he walks. *Id.* at 564. Dr. Patel assessed growth hormone deficiency, delayed puberty,
11   hypothyroidism, and SCFE. *Id.* at 565. Dr. Patel noted that he was pleased with Plaintiff's
12   current growth rate, and reassured by Plaintiff's hormone levels. AR at 565.

13       On February 27, 2012, Plaintiff was seen in the ED at St. Joseph's reporting that he
14   had used his albuterol inhaler and experienced an extremely fast heart rate. *Id.* at 528–33.
15   Tammy Kastre, M.D.'s physical examination of Plaintiff was unremarkable. *Id.* at 530–31.
16   Plaintiff was given an albuterol nebulizer while at the hospital, but did not have any side
17   effects. *Id.* at 531. As such, Plaintiff was released home. *Id.*

18       On March 13, 2012, Plaintiff saw Jonathan Pasternack, M.D. to establish care. AR
19   at 559–62. Dr. Pasternack's physical examination was unremarkable, and his assessment
20   included hypothyroidism, growth hormone deficiency, recent hip surgery, and a "mood
21   disorder of short duration[.]" *Id.* at 561. On March 22, 2012, Plaintiff had a follow-up visit
22   with Dr. Nielsen for his hip. *Id.* at 653. Plaintiff reported that his "hips feel fine and that
23   they only occasionally give him a little bit of trouble." *Id.* On March 28, 2012, Plaintiff
24   returned to see Dr. Pasternack. *Id.* at 556–58. Dr. Pasternack reported that "[t]he
25   appointment was devoted to a conversation regarding the issues of his anxieties[.]" AR at
26   557. Plaintiff reported issues "related to anxiety and social groups and particularly in
27   school[,]" as well as anxiety at home at night. *Id.* Plaintiff denied suicidal thinking and

28                                                    - 15 -

1  "describe[d] himself as having friends but tentatively." *Id.* at 557.  Plaintiff indicated that

2  at Pima Community College he receives "supportive services" in the form of a note-taker,

3  recorder, extra time for exams and homework, and a separate room for exams. *Id*. at 558,

4  666–69.

5       On April 16, 2012, Plaintiff returned to Dr. Pasternack for a follow-up. *Id.* at 553–55.

6  Plaintiff reported that after his prescription for guanfacine, "[h]e is now sleeping through the

7  night and wakes up feeling rested." AR at 554.  Plaintiff further reported the ability "to

8  engage other students socially with minimal anxiety." *Id.* Dr. Pasternack noted that Plaintiff

9  was "[v]ery pleased!" *Id.* On April 23, 2012, Plaintiff saw Dr. Pasternack for a medication

10 evaluation. *Id.* at 550–52.  Plaintiff reported that his sense of wellness and restful sleep on

11 guanfacine lasted one week, and is now suffering nightmares and anxiety regarding social

12 encounters with peers. *Id.* at 551.  Plaintiff requested psychological counseling. AR at 551.

13 On April 30, 2012, Plaintiff followed-up with Dr. Pasternack. *Id.* at 547–49.  Plaintiff had

14 been placed on Zoloft the previous week, but is not having the immediate response that he

15 had hoped. *Id.* at 548.  Plaintiff reported not feeling suicidal, and is attending school, "but

16 with discomfort socializing with other students." *Id.*

17       On May 18, 2012, Plaintiff saw Dr. Chetanbabu Patel for a follow-up endocrinology

18 visit. *Id.* at 542–46.  Dr. Patel reported that Plaintiff was "doing well with no leg pain or hip

19 pain[,]" and that he had "start[ed] to run and exercise a little bit more now." AR at 543.  Dr.

20 Patel's physical examination was unremarkable, although Plaintiff reported some hip pain

21 when he walks. *Id.* Dr. Patel recommended continuing Plaintiff's current course of

22 treatment. *Id.* at 544.  On May 21, 2012, Plaintiff saw Dr. Pasternack for a follow-up

23 regarding Plaintiff's medications. *Id.* at 539–41.  Plaintiff reported a number of phobias, and

24 his Zoloft dosage increased. *Id.* at 540.  Plaintiff also reported a reddish bumpy rash on his

25 cheeks and forehead, which Dr. Pasternack suggested was contact dermatitis. AR at 540.

26 On May 16, 2012, Plaintiff was seen at La Frontera for a new client behavioral health

27 assessment. *Id.* at 607–10.  Plaintiff's stated goal for services if "to be less depressed and

28                                              - 16 -

anxious." *Id.* at 576, 578, 610.  Plaintiff indicated he has issues with nervousness and depression, including feeling like he looks different from other people, a fear of speaking in public because others will think ill of him, feelings of wanting to hurt people whom he perceives are looking at and talking about him, and worry to the point of losing concentration in school. *Id.* at 610.  Plaintiff also reported feeling depressed, resulting in a desire to sleep, low energy, low mood, irritability, concentration issues, and poor self-esteem. *Id.*  Plaintiff reported being picked on in school, feeling powerless, and with a desire to hurt the person picking on him. AR at 610.  Plaintiff also reported having nightmares about his family being hurt or killed. *Id.*  On May 23, 2012, Plaintiff was again seen at La Frontera. *Id.* at 595–601. Plaintiff reported that his increased anxiety and depression had "been going on for 'three months or so.'" *Id.* at 600.  Plaintiff denied that his anxiety around people, and belief that people are talking about him and looking at him has been an ongoing issue of long duration. *Id.* at 600–01. Plaintiff's mental status exam indicated that Plaintiff was anxious, but friendly and cooperative, he displayed good eye contact, clear speech, attentive, focused, and alert, and his thought process was organized, logical, and free of psychosis, denying any suicidal or homicidal ideations.  AR at 601.

On June 26, 2012, Plaintiff saw Dr. Pasternack for a follow-up regarding his medication. *Id.* at 536–38.  Plaintiff reported that his anxiety was more manageable, and his sleep is improved, although he still suffers from nightmares. *Id* at 537.  Plaintiff reported keeping a diary. *Id.*  On June 27, 2012, Plaintiff was seen by at La Frontera for ongoing psychological services. *Id.* at 573–89.  Plaintiff "stated that he would like to learn how to relax around people[,]" because his anxiety causes him to avoid people and isolate at home. AR at 588.  Plaintiff reported feeling fearful around other, and that he does not have peer relationships due to his social anxiety. *Id.*  Plaintiff was scheduled to "engage in 1:1 therapy and case management services[,]" but "declined to attend group therapy and employment services at this time." *Id.* at 578.  Additionally, notes indicate that Plaintiff was not prescribed medications at his initial appointment. *Id.*  Plaintiff also indicated that he would

1    like to bring his parents to therapy, which was acceptable to the clinician.  *Id.* at 580, 583.

2    Plaintiff stated that he was doing okay, his vacation had been great thus far, and he was

3    returning to Mexico the following day for another month.  AR at 586.

4         On August 2, 2012, Plaintiff saw Ms. Leslie Ulloa at La Frontera for a counseling

5    session.  *Id.* at 631–39.  Plaintiff "talked about his struggles what [sic] his anxiety especially

6    when it comes to socializing."  *Id.* at 639.  Ms. Ulloa noted that his anxiety does not appear

7    to happen when Plaintiff is in Mexico.  *Id.*  Plaintiff indicated that his symptoms started when

8    he was in middle school, and that he felt inferior to his peers as they entered puberty.  *Id.*

9    Plaintiff also reported that his anxiety increases when he is away from his parents, as he

10   worries about them.  AR at 639.  Plaintiff also met with Ms. Justine Pigott, a Recovery

11   Facilitator.  *Id.* at 634.  Ms. Pigott noted that hey discussed Plaintiff's feelings about his

12   father's issues trying to obtain social security benefits after being injured in a work accident.

13   *Id.*  Plaintiff indicated that it was stressful for the entire family.  *Id.*  On August 22, 2012,

14   Plaintiff again saw Ms. Ulloa for counseling.  *Id.* at 621–24.  They discussed Plaintiff's

15   anxiety regarding the first day of school, and Ms. Ulloa provided Plaintiff some techniques

16   for decreasing his anxiety.  AR at 622.

17        On September 6, 2012, Plaintiff returned for counseling with Ms. Ulloa.  *Id.* at

18   613–16.  Plaintiff discussed his frustration with his parents "pressuring" him to make friends.

19   *Id.* at 616.  Ms. Ulloa noted that Plaintiff "continue[d] to have a difficult time socializing and

20   connection [sic] with other peers due to his anxiety."  *Id.*  She further noted his apparent

21   dependence upon his parents, and noted that Plaintiff "is thinking about employment."  *Id.*

22    On September 11, 2012, Plaintiff met with his new case manager at La Frontera.  AR

23   611–12.  On September 18, 2012, Plaintiff saw Dr. Pasternack for a medication follow-up.

24   *Id.* at 656–60.  Plaintiff also had a counseling session with Ms. Ulloa.  *Id.* at 661–62.  Ms.

25   Ulloa noted Plaintiff was making progress, as he approached a peer at school.  *Id.*

26   Additionally, Plaintiff reported decreasing negative thoughts resulting in decreased anxiety.

27   *Id.*  On September 27, 2012, Dr. Pasternack completed a Treating Physician's Assessment

28

of Residual Functional Capacity regarding Plaintiff.  AR at 663–65.  Dr. Pasternack diagnosed Plaintiff with hypothyroidism, short stature, anxiety, and phobias.  *Id.* at 663.  Dr. Pasternack indicated that Plaintiff would be capable of sedentary and light work.  *Id.*  Light work requiring "lifting 20 pounds maximum, with frequent lifting or carrying of objects weighing up to 10 pounds."  *Id.*  Dr. Pasternack opined that Plaintiff was not strong enough for medium, heavy or very heavy work.  *Id.* at 663–64.  Dr. Pasternack further opined that Plaintiff could frequently lift or carry ten (10) pounds, with a maximum lift or carry of twenty (20) pounds; stand or walk one (1) hour at a time or two (2) hours in an eight (8) hour work day; sit for four (4) hours at a time; and push or pull for one (1) hour in an eight (8) hour work day.  AR at 664.  Dr. Pasternack found Plaintiff unlimited in his ability to reach, handle, finger, feel, see, hear, or speak.  *Id.*  Dr. Pasternack further opined that Plaintiff could never climb, occasionally balance, and frequently stoop, kneel, crouch, or crawl.  *Id.*  Plaintiff's prognosis was deemed fair.  *Id.* at 665.

### 3.  Plaintiff's Reports from Education Providers

On September 17, 2004, Ms. Naomi Varga of Townsend Middle School wrote to the SSA requesting reconsideration of the Administration's decision regarding services for Plaintiff.  AR at 252.  A Teacher Questionnaire was completed by his Reading teacher, as well.  *Id.* at 244–50.  At the time, Plaintiff was in the sixth (6th) grade, and reading at a second (2nd) grade level.  *Id.* at 244.  Regarding Plaintiff's ability to acquire and use information, his teacher reported that he had a serious problem.  *Id.* at 245.  Plaintiff was reported to have an obvious problem comprehending oral instructions and understanding school and content vocabulary; a serious problem expressing ideas in written form, learning new material, and recalling and applying previously learned material; and a very serious problem applying problem-solving skills in class discussions.  *Id.*  Plaintiff's teacher described him as a hard worker, but his reading comprehension and vocabulary were low, and he had difficulty making predictions, answering questions, and doing independent work.  AR at 245.  Regarding Plaintiff's ability to interact and relate with others, his teacher

indicated that he had no problems playing cooperatively with other children; appropriately seeking attention, expressing anger, and asking permission; following class rules and respecting/obeying adults in authority; using language appropriate to the situation and listener; taking turns in a conversation; and interpreting the meaning of facial expression, body language, hints, and sarcasm. *Id.* at 247. Plaintiff exhibited an obvious problem in relating experiences and telling stories; introducing and maintaining relevant and appropriate topics of conversation; and using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation. *Id.* Plaintiff's teacher reported that no behavior modifications strategies had been necessary, and that he had been receiving support from special education, including speech services. *Id.* at 247–48. Plaintiff's teacher also reported that Plaintiff had no problems moving about and manipulating objects. *Id.* at 248.

On August 19, 2010, Ms. S.G. Wickens, Plaintiff's Special Education Math Teacher, completed a Teacher Questionnaire. AR at 225–32. Ms. Wickens reported that Plaintiff had no problem comprehending oral instructions; comprehending and doing math problems; understanding and participating in class discussions; and learning new material. *Id.* at 226. Ms. Wickens reported that Plaintiff had a slight problem understanding school and content vocabulary; providing organized oral explanations and adequate descriptions; recalling and applying previously learned material; and applying problem solving skills in class discussions, as well as an obvious problem reading and comprehending written material. *Id.* Ms. Wickens described Plaintiff as a motivated student who applies himself, pays close attention to instruction, and able to work independently. *Id.* at 226. Ms Wickens further reported that Plaintiff had no problems paying attention when spoken to directly; focusing long enough to finish assigned activity or task; refocusing to task when necessary; carrying out single-step instructions; waiting to take turns; changing from one activity to another without being disruptive; organizing own things or school materials; completing class/homework assignments; working without distracting self or others; and working at a reasonable pace and finishing on time. *Id.* at 227. Ms. Wickens further reported that

Plaintiff had slight problems carrying out multi-step instructions and completing work accurately without careless mistakes.  AR at 227.  She also noted that Plaintiff "combats his academic deficiencies by paying attention closely, following directions well, and working hard." *Id.*  Ms. Wickens indicated that Plaintiff had no problems playing cooperatively with other children; making and keeping friends; seeking attention appropriately; asking permission appropriately; following rules; respecting authority; using language appropriate to the situation; taking turns in conversation; and using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation, and further found him to have only a slight problem expressing anger appropriately; relating experiences and telling stories; and interpreting meaning of facial expressions, body language, hints, and sarcasm. *Id.* at 228.  Ms. Wickens also noted a slight problem with Plaintiff's ability to integrate sensory input with motor output, and to identify and appropriately assert his emotional needs. *Id.* at 229–30.  Ms. Wickens identified no problems with Plaintiff's ability to handle frustration appropriately; be patient; take care of personal hygiene; care for physical needs; use good judgment regarding personal safety and dangerous circumstances; respond appropriately to changes in own mood; use appropriate coping skills to meet daily demands of school environment; and know when to ask for help. *Id.* at 230.

Records from Tucson Unified School District indicate that Plaintiff required accommodations in instruction including the way that assignments were explained, additional time to complete assignments, clarification of directions, and extended testing time.  AR at 399.  Plaintiff received a Specific Learning Disability ("SLD") and a Speech/Language Impairment ("SLI") Individual Education Program ("IEP") for each year he attended high school. *Id.*; *see also* AR at 400–18.

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3);

1   *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the

2   Commissioner's denial of disability insurance benefits when the ALJ's findings are based

3   on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

4   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v.*

5   *Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

6   Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

7   preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

8   873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

9   Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

10  as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

11  Where "the evidence can support either outcome, the court may not substitute its judgment

12  for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

13  1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

14  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must

15  consider the entirety of the record weighing both evidence that supports as well as that which

16  detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

17

18  **III.   ANALYSIS**

19  The Commissioner follows a five-step sequential evaluation process to assess whether

20  a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:

21  Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not

22  disabled; step two considers if the claimant has a "severe medically determinable physical

23  or mental impairment[.]" If not, the claimant is not disabled; step three determines whether

24  the claimant's impairments or combination thereof meet or equal an impairment listed in 20

25  C.F.R. Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; step four considers the

26  claimant's residual functional capacity and past relevant work.  If claimant can still do past

27  relevant work, then he or she is not disabled; step five assesses the claimant's residual

28

functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff was eligible for supplemental security income benefits as a child, and attained age eighteen (18) on June 10, 2010, at which time his disability was redetermined based on the rules for adults who file new applications.  AR at 18.  The ALJ further found that Plaintiff was not engaged in substantial gainful activity since May 1, 2004.  *Id.*  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: borderline intellectual functioning, learning disability, hip pain, and asthma (20 CFR 404.1520(c))."  *Id.*  The ALJ also acknowledged Plaintiff's complaints of growth hormone deficiency; delayed puberty; short stature; hypothyroidism; headaches; and anxiety disorder, but found that "these allegations produce no more than minimal limitations upon the claimant's ability to perform work-related activities[,]" and as such found them to be not "severe."  *Id.*  At step three, the ALJ found that Plaintiff does "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  *Id.*  At step four, the ALJ found that Plaintiff had "the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except the claimant can understand, remember, and carry out a two-step command involving simple instructions.  *Id.* at 20.  Accordingly, at step five, the ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  *Id.* at 27.  As such, the ALJ found that Plaintiff's "disability ended on January 1, 2011, and [he] has not been under a disability, as defined in the Social Security Act through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g), 416.987(e) and 416.920(g))."  AR at 27.  Plaintiff asserts that the ALJ erred in  1) finding that "certain of the Plaintiff's medically determinable mental and physical conditions are

- 23 -

1    'nonsevere[;]'" 2) finding Plaintiff's subjective complaints not credible; and 3) rejecting the

2    opinions of treating physician Dr. Pasternack and examining physician Dr.Sanchez without

3    "specific and legitimate" reasons supported by substantial evidence in the record.   Pl.'s

4    Opening Brief (Doc. 18) at 6–28.

5              **A.      *Non-Severe Medical Impairments***

6              Plaintiff "objects to the ALJ's finding that Plaintiff's endocrine disorders (growth

7    hormone deficiency, delayed puberty, short stature, and hypothyroidism), headaches,

8    depression[,] and anxiety disorder are 'non-severe'" and asserts that this finding is factually

9    and legally without merit.   Pl.'s Opening Brief (Doc. 18) at 7.

10             "An impairment or combination of impairments is not severe if it does not

11   significantly limit [a Claimant's] ability to do basic work activities."  20 C.F.R. §§ 404.1521,

12   416.921; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).   "A physical or mental impairment

13   must be established by medical evidence consisting of signs, symptoms, and laboratory

14   findings[.]" 20 C.F.R. §§ 404.1508, 416.980.  Furthermore, the impairment "must have lasted

15   or must be expected to last for a continuous period of at least 12 months."   20 C.F.R. §§

16   404.1509, 416.909.   "The severity regulation increases the efficiency and reliability of the

17   evaluation process by identifying at an early stage those claimants whose medical

18   impairments are so slight that it is unlikely they would be found to be disabled even if their

19   age, education, and experience were taken into account."  *Bowen v. Yuckert*, 482 U.S. 137,

20   153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

21             As an initial matter, Plaintiff's alleged depression and anxiety did not commence until

22   March 2012.  AR 559–62, 607–10; *see also* Pl.'s Opening Br. (Doc. 18) at 11–12.  As such,

23   these impairments do not meet the durational requirements of the regulations.  *See* 20 C.F.R.

24   §§ 404.1509, 416.909.  As such, they cannot be deemed severe.  The ALJ's correctly found

25   that these symptoms "appear[] to be of recent onset and [are] currently stable" and therefore,

26   non-severe.

27             Furthermore, the medical records reflect that Plaintiff often reported "no headaches"

28                                           - 24 -

to his medical providers, and at times occasional headaches.  AR at 341, 344, 346, 348, 352, 359, 363, 368, 425, 477, 534, 569.  In May 2011, Plaintiff reported having headaches three (3) times per day, which were alleviated somewhat by taking Advil.  *Id.* at 293–94.  In December 2011, Plaintiff went to the Emergency Department complaining of *inter alia* shakiness and near daily headaches.  AR at 534–35.  At that time, it was suggested that Plaintiff may have been using non-diluted albuterol in his nebulizer with toxic affects.  *Id.* at 535.  After this visit, Plaintiff's headache complaints no longer appear in the records.  The Court finds that the ALJ did not err in finding Plaintiff's headaches non-severe.

Regarding Plaintiff's endocrine disorders, Plaintiff concedes, as he must, that the ALJ included "hip pain" as a severe impairment.  Pl.'s Opening Br. (Doc. 18) at 10.  Plaintiff argues that "hip pain" is more properly defined as SCFE.  *Id.*  This impairment encapsulates any issues that Plaintiff may have due to his endocrine disorders, and the ALJ found it severe.  AR at 18.  Indeed, in January 2012, Plaintiff reported "body-building" to his endocrinologist in an attempt to gain weight.  *Id.* at 564.  In light of the medical records, the ALJ did not err in finding the endocrine disorders as non-severe.  Moreover, even if the ALJ erred in his determinations regarding non-severe impairments, any such error was harmless.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  The Court finds that the ALJ considered all symptoms in his Step 4 analysis and his decision regarding Plaintiff's residual functional capacity.  AR at 20–26; *see also Lewis*, 498 F.3d at 911.

### B.    *Plaintiff's Credibility*

Plaintiff asserts that the ALJ "gave no clear rationale as to why the Plaintiff was deemed not credible."  Pl.'s Opening Br. (Doc. 18) at 17.  The Commissioner argues that "[t]he ALJ provided specific, legitimate, clear, and convincing reasons for discounting Figueroa's subjective complaints."  Def.'s Response (Doc. 20) at 20.  The Court agrees with the Commissioner.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."  *Lingenfelter v. Astrue*, 204 F.3d

1028, 1035-36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that [his] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted).  "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.' *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163.  "Contradiction with the medical records is [also] a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Comm'r of the SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008) (citations omitted).

Here, in assessing Plaintiff's credibility, the ALJ noted that "[t]he claimant testified initially that he did not feel like working during the summer because he wanted to go to Mexico with parents.  He would later recant and state that it was because he was afraid, that he might decompensate over fear of scrutiny and criticism by the boss or employees."  AR at 21.  The ALJ further noted that Plaintiff testified that he had aggressive thoughts about others, but the record does not reflect Plaintiff ever reporting feelings of homicidal ideation. *Id.* at 24.  The ALJ went on to state that:

> When there is a significant difference between the claimant's testimony as to the nature frequency and severity of his symptoms and the descriptions in the medical records, a question as to the credibility of the testimony is raised.  Why would the claimant give a more accurate description of his symptoms to the ALJ than to his treating physicians?  The undersigned has nothing to offer to ameliorate these complaints; whereas the doctors may.  If anything, the reverse should occur.  The more accurate description should appear in the medical records.
>
> When complaints are absent from the medical record or when the medical records do not reflect the same degree of severity or frequency, it is reasonable to assume one of two things.  Either the claimant did not tell the doctors about these symptoms, their severity and their frequency, or the doctors deemed such complaints insignificant.  Either conclusion undermines the credibility of the claimant's testimony.

*Id.*  A review of the record confirms the ALJ's analysis regarding inconsistencies in Plaintiff's testimony, as well as a failure to seek treatment by not disclosing all symptoms to his medical providers.  Accordingly, the Court finds that the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's testimony, and this determination is supported by substantial evidence.

### C.    *Treating and Examining Physician Opinions*

Plaintiff asserts that "the ALJ's assessment of opinions [sic] evidence is inconsistent with controlling authority and not supported by the evidence."  Pl.'s Opening Br. (Doc. 18) at 22.  The Commissioner argues that the ALJ met his burden to provide specific and legitimate reasons, supported by substantial evidence by summarizing the conflicting evidence, interpreting it, and making findings.  Def.'s Response (Doc. 20) at 15.

"As a general rule, more weight should be given to the opinion of a treating source

than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).

The ALJ rejected Dr. Sanchez's opinions because he "examined the claimant on a one-time basis and had no treating relationship with the claimant, which renders his opinions less persuasive." AR at 26 (citing 20 C.F.R. §§ 404.1527(e) and 416.927(e)). As an initial matter, Dr. Sanchez indicated that "[t]here were no IEP records or teacher report records available to the examiner." *Id.* at 423. Such records were considered by the ALJ in weighing the evidence. *See id.* at 20–26. Moreover, the ALJ did not reject Dr. Sanchez's Full Scale IQ results, which are greater than allowed by the listing for a Step 3 finding of disability. AR

1   at 19; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  In making his Step 4 RFC determination,

2   the ALJ set "out a detailed and thorough summary of the facts and conflicting clinical

3   evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421

4   (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Furthermore, this Court

5   "must uphold the ALJ's decision where the evidence is susceptible to more than one rational

6   interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  As such, the ALJ

7   met his burden in discounting Dr. Sanchez's opinion.

8        The ALJ rejected Dr. Pasternack's opinions, because "[t]he impact noted in the

9   opinion seems more based upon the subjective and self-reported limits of the claimant than

10  any review of the record as a whole."  AR at 26; *cf. Tommasetti v. Astrue*, 533 F.3d 1035,

11  1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a

12  large extent' on a claimant's self-reports that have been properly discounted as incredible").

13  Moreover, Dr. Pasternack's opinions "regarding the claimant's ability to walk, stand, and sit

14  are initially inconsistent with the record as a whole and in fact seems to depart from the other

15  clear findings of other treating sources without adequate explanation for the difference."  AR

16  at 26.  "[T]he ALJ provided adequate reasons, under the appropriate legal standard, for

17  finding that [Dr. Pasternack's] opinion [was] not controlling." *Rollins*, 261 F.3d at 856.  As

18  such, the ALJ's finding is affirmed.

19  . . .

20  . . .

21  . . .

22  . . .

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28  . . .

## V.      CONCLUSION

In light of the foregoing, the Court affirms the Commissioner's decision. Accordingly, IT IS HEREBY ORDERED that:

1)      Plaintiff's Opening Brief (Doc. 18) is DENIED;

2)      The Commissioner's decision is AFFIRMED; and

3)      The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 29th day of September, 2015.

Bruce G. Macdonald
United States Magistrate Judge